UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DRUGPLACE, INC. (FL) et al., Movants, -v.- ELI LILLY AND COMPANY, Respondent. | : | OPINION AND ORDER<br>26-MC-362 (RA)(GWG) |

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

DrugPlace Inc. (FL), DrugPlace, Inc. (TN), Community Health Initiative, Inc., Nakron Wholesalers, LLC, Galaxy Med, LLC d/b/a Galaxy Pharmacy, Brightline Wholesale LLC, Paul Leight, Keving Singer, Edgar Enriques, Lane Mazei, Danielle Giscombe, Readus Smith, Jerry Maynard Sr., and Jerry Maynard Jr. (collectively "Petitioners") have moved to quash all of the subpoenas served on various financial institutions in connection with discovery sought by respondent Eli Lilly and Company for an action brought by Lilly against the Petitioners in the Southern District of Florida.[1] In that action, Lilly makes claims for relief against the Petitioners based on allegations of fraud, conspiracy, and unjust enrichment. See Complaint, dated May 15,

[1] See Motion to Quash Subpoenas, filed July 21, 2026 (Docket # 1) ("Mem."); Declaration of Michelle G. Bernstein, filed July 21, 2026 (Docket # 4) ("Berstein Decl."); Memorandum of Law in Opposition, filed July 28, 2026 (Docket # 7) (redacted version filed at Docket # 18) ("Opp."); Declaration of Geoffrey Potter, filed July 28, 2026 (Docket # 8) ("Potter Decl."); Reply Memorandum of Law, filed Aug. 6, 2026 (Docket # 19) ("Reply"); Declaration of Michelle G. Berstein, filed Aug. 6, 2026 (Docket # 20) ("2d Bernstein Decl."); Notice of Supplemental Authority, filed Sept. 2, 2026 (Docket # 37) Notice of Related Discovery Motion, filed Sept. 2, 2026, (Docket # 39); Letter Response to Notice of Related Discovery Motion, filed Sept. 8, 2026 (Docket # 40).

2026, filed in Lilly v. DrugPlace, Inc., (S.D. Fla.) (annexed as Ex. J to Bernstein Decl. (Docket # 4–10)) ("Compl."). For the reasons set forth below, Petitioners' motion is denied.

## I. BACKGROUND AND RELEVANT PROCEDURAL HISTORY

### A. The Underlying Case

In the Southern District of Florida case, Lilly alleges that Petitioners are responsible for a complex and wide-ranging prescription fraud involving the drug Trulicity. The essence of Lilly's claim is that Petitioners fraudulently received hundreds of millions of dollars' worth of rebates from Lilly by (1) using intermediaries to conceal their involvement, (2) misrepresenting their patient population, and (3) acting as unauthorized distributors. See Opp. at 1–2.

To understand the alleged fraud, we briefly explain how Lilly's rebate program operates according to Lilly's complaint.

Lilly only pays rebates when its products (such as Trulicity) are actually dispensed to patients. Compl. ¶ 62. Lilly pays rebates to various types of entities, including: pharmacies, Pharmacy Benefit Managers ("PBMs"), and rebate aggregators. Id. ¶¶ 48–58. PBM's act as an intermediary between drug manufacturers, pharmacies and insurers; rebate aggregators will pool rebate claims from entities such as PBMs. Id. ¶¶ 51–58. One way these entities dispense Lilly products to patients is by contracting with prescription cost share programs. Id. ¶ 65. Here, petitioner Community Health acted as a prescription cost share program for members of the Church of God Christ and petitioner DrugPlace acted as a PBM and pharmacy for Community Health. Id. ¶¶ 16, 65.

The PBMs and pharmacies do not receive Lilly products directly from Lilly. Id. ¶ 97. Instead, Lilly sells its prescription drugs to various wholesalers who then distribute the drugs

across the country to PBMs and pharmacies. Id. Because of this process, Lilly has limited ability to trace their products and tie them to specific rebate claims. Id. ¶¶ 96–97.

The relationship between Lilly and Petitioners dates back to 2011. Id. ¶ 65. From 2011 to 2015, DrugPlace contracted with Lilly to receive rebates for acting as both a PBM and a pharmacy for Community Health. Id. Lilly alleges that this program was largely fraudulent and that there were minimal to zero patients receiving Lilly products from DrugPlace and Community Health. See id. ¶¶ 119–46. After conducting an audit and noticing various anomalies in DrugPlace's rebate requests, including their sheer volume, Lilly did not renew its rebate contract with DrugPlace. See id. ¶¶ 68–90.

The non-renewal, however, did not end DrugPlace's efforts to obtain rebates. Lilly alleges that between the years 2020 and 2025, DrugPlace was secretly collecting hundreds of millions of dollars' in rebate payments from Lilly. Id. ¶¶ 91–92. Specifically, Lilly asserts that: "Since 2020, DrugPlace has submitted, through intermediaries, rebate claims for hundreds of thousands of boxes of Trulicity, seeking more than $250 million in fraudulent rebates — an average rate of over $40 million per year. At their peak, DrugPlace-affiliated rebate claims corresponded to nearly $75 million worth of Trulicity per year." Id. ¶ 191

The alleged scheme involved two parts: a rebate scheme and a wholesaler scheme. For the rebate scheme, DrugPlace portrayed itself to wholesalers as a PBM and pharmacy for Community Health. Id. ¶ 173. This allowed DrugPlace to purchase Trulicity from wholesalers for the limited purpose of filling prescriptions for Community Health members. Id. ¶ 174. DrugPlace would then submit its rebate claims to a rebate aggregator. Id. ¶ 100. This aggregator would then submit the collected rebate claims to one of two major PBMs. Id. These PBMs would then submit the rebate claims directly to Lilly for payment. Id. By using various

intermediaries, DrugPlace managed to hide the fact that it was the true source of the rebate claims. Id. ¶ 101.

For the wholesaler scheme, after DrugPlace purchased Lilly medications from wholesalers, it would transfer the medications to Nakron. Id. ¶¶ 174–77. Nakron, which is an authorized wholesaler, is alleged to be a commonly owned entity and affiliate of DrugPlace. Id. ¶ 177. Nakron and DrugPlace would conceal these transactions, thereby erasing DrugPlace from the chain of distribution. Id. Nakron would then sell Trulicity on the secondary market. Id. So rather than distributing Trulicity to patients directly, DrugPlace acted as a de facto wholesaler. Id. ¶¶ 95, 177.

The other defendants, Galaxy Med and Brightline are alleged to have operated the same scheme. Id. ¶¶ 173–77. Lilly alleges that Galaxy acted as DrugPlace and submitted fraudulent rebate claims, while Brightline acted as Nakorn and was the wholesaler of Trulicity. Id. Lilly alleges that Galaxy and Brightline are essentially affiliates of DrugPlace. Id. ¶¶ 152–53, 172.

The non-corporate Petitioners are alleged to have occupied various roles across the named entities and personally profited from the scheme. Id. ¶¶ 178–80. For example, Kevin Singer is Vice President of DrugPlace and the sole member of Nakron; Lane Mazei is the Manager of Galaxy and Brightline; and Edgar Enriquez is the General Manager of Nakron and listed as the contact person for Community Health. Id. ¶¶ 28–38.

B. The Disputed Subpoenas

On May 22, 2026, Lilly filed a motion for a temporary restraining order, preliminary injunction, and expedited discovery in the Southern District of Florida. See Plaintiff's Expedited Motion, dated May 22, 2026, filed in Lilly v. DrugPlace, Inc., 26 Civ. 23516 (S.D. Fla.) (annexed as Ex. 5 to Potter Decl. (Docket # 8-5)). Initially, Lilly sought "all bank, investment, brokerage,

cryptocurrency, and other financial accounts that any Movant has held, has controlled, is or was a beneficiary of, or has a signatory authority for, as well as the current balances thereof." Proposed TRO & OSC, dated May 22, 2026, filed in Lilly v. DrugPlace, Inc., 26 Civ. 23516 (S.D. Fla.) (annexed as Ex. 6 to Potter Decl. (Docket # 8-6)). Rather than supply the requested financial records themselves, Petitioners and Lilly reached a compromise that allowed Lilly to pursue expedited discovery from third parties. Mem. at 3–4. The Florida District Court agreed to this compromise and entered a stipulated order on June 9, 2026, that so provided. See Stipulated Preliminary Injunction Order, filed June 9, 2026 in Lilly v. DrugPlace, Inc., 26 Civ. 23516 (S.D. Fla.) (annexed as Ex. 4 to Potter Decl. (Docket # 8-4)) ("Stipulated Order").

Pursuant to and following entry of the Stipulated Order, Lilly served a total of 1,016 subpoenas between June 12 and July 13, 2026. Mem. at 5, 9. Almost all the subpoenas were issued to banks, with the remaining two issued to The Clearing House Payments Company LLC. Id. 5–10. All the subpoenas had the same compliance location: the New York office of Lilly's counsel. Id. at 10.

The subpoenas served on the banks all request the same information spanning from January 1, 2019 to present.[2] Id. at 5, 9. The subpoenas list five topic areas, many with multiple subparts. See Schedule A to Bank Subpoenas, filed July 21, 2026, annexed as Ex. C to Bernstein Decl. (Docket # 1-3). The subpoenas seek, for example, identification of all accounts belonging to each defendant and for each such account: all account statements, transactions, and wire transfers. For each transaction identified, the subpoenas seek documents showing the name,

[2] Petitioners contend that the contents of one subpoena, served on Wells Fargo, has not been disclosed to them. See Mem. at 9. It is unclear if Lilly has since provided the subpoena to petitioners. If not, Lilly should provide it forthwith. Petitioners are free to file a new motion to quash as to this subpoena if they have a basis for doing so that is not resolved by this Opinion and Order.

address and account number of the originator/sender and recipient/beneficiary. Id. The subpoenas also seek identifying information for accounts accessed online and by phone. Id.

The Clearing House Subpoenas make two requests for documents, which similarly concern the period January 1, 2019, to the present: "[(1)] All CHIPS payment messages involving any Defendant, regardless of whether that Defendant originated or received such payment and [(2)] [t]o the extent not included in Document 1, all payment messages involving any defendant that were translated, converted, or mapped over from SWIFT, Fedwire, or any other electronic funds transfer messaging systems." Clearing House Subpoenas, dated July 9, 2026, annexed as Ex. H to Bernstein Decl. (Docket # 1-8) at 7.

Lilly has received various responses since these subpoenas were sent out, which we divide into three groups. In Group 1 are subpoenas to banks that have either responded that they possess no responsive materials or have not responded at all but as to which Lilly is no longer seeking a response. Opp. at 8. Group 2 consists of subpoenas to 46 banks that have produced responsive documents. Id. at 8–9. Group 3 consists of nine subpoenas that remain outstanding inasmuch as Lilly has not received a response and is still actively pursuing responses. Id.

At the time it served the subpoenas, Lilly did not provide advance notice to Petitioners. Mem. at 2. Lilly asserts that no notice was required because the Stipulated Order provided that Lilly did not "need to comply with Rule 45(a)(4)." See Opp. at 2. As a result, Petitioners first learned about the subpoenas when some banks notified Petitioners. Mem. at 2. On July 3, 2026, Petitioners moved in the Southern District of Florida to clarify that notice was required one business day after the service of subpoenas. Id. at 4. On July 7, 2026, the Florida District Court ordered Lilly to provide the requested notice. See Paperless Order, dated July 7, 2026, filed in

Lilly v. DrugPlace, Inc., 26 Civ. 23516 (S.D. Fla.) (annexed as Ex. 9 to Potter Decl. (Docket # 8-9)) at 12.

After Lilly provided Petitioners with notice of the disputed subpoenas, Petitioners filed the instant motion in this Court to quash all 1,016 subpoenas.

## II. DISCUSSION

### A. Standing

Lilly argues that Petitioners lack standing to quash any of the subpoenas. See Opp. at 12–15. To establish Article III standing, movants must establish that "(1) [they] suffered an injury-in-fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision." United States v. Binh Tang Vo, 78 F. Supp. 3d 171, 175 (D.D.C. 2015) (citation omitted). Generally, "only recipients of a subpoena have standing to seek a protective order quashing or modifying the subpoena." City of Almaty, Kazakhstan v. Ablyazov, 2020 WL 1130670, at *1 (S.D.N.Y. Mar. 9, 2020) (citation omitted). Notwithstanding this general rule, "a non-subpoenaed individual or entity has standing to quash a subpoena if the individual or entity is seeking to protect a personal privilege or right." Silverstone Holding Grp., LLC v. Zhongtie Dacheng (Zhuhai) Inv. Mgt. Co., Ltd., 650 F. Supp. 3d 199, 202 (S.D.N.Y. 2023) (internal punctuation and citation omitted). Thus, "whether a non-[subpoenaed] party has standing to quash a subpoena served on [a] non-party depends on the nature of the information sought." First Indem. of Am. Ins. Co. v. Shinas, 2005 WL 3535069, at *3 (S.D.N.Y. Dec. 23, 2005). Courts in this Circuit have routinely held that "individuals, whose banking records are subpoenaed, have a privacy interest in their financial affairs that gives them

standing to move to quash a subpoena served on a non-party financial institution." Arias-Zeballos v. Tan, 2007 WL 210112, at *1 (S.D.N.Y. Jan. 25, 2007) (collecting cases).

Here, Petitioners are seeking to prevent the release of their private banking information and thus have standing to challenge the subpoenas that make up Group 2 and Group 3 — subpoenas which actually risk disclosing Petitioners financial information because they are either still outstanding or have already produced responsive documents.

Petitioners do not have standing to quash the subpoenas contained in Group 1, however. Petitioners have suffered no injury from the issuance of the Group 1 subpoenas because the subpoenaed entities do not have any of their financial information. And Lilly is no longer pursuing a response from the entities that have failed to provide information. Even though Petitioners have a privacy interest in their personal financial information, that interest does not confer standing when there is no threat of disclosure. In any event, as explained below, even if Petitioners had standing to quash these subpoenas, their motion would be rendered moot.

Lastly, we reject the argument that the subpoenas are invalid on the ground that they violate Rule 45's 100-mile requirement. See Mem. at 15. Per Rule 45(c)(2), a subpoena must command "production of documents, electronically stored information, or tangible things at a place within 100 miles of where the [subpoena recipient] resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(2). We reject the argument because a "party lacks standing to challenge subpoenas issued to non-parties on the grounds of . . . undue burden." Universitas Educ., LLC v. Nova Grp., Inc., 2013 WL 57892, at *5 (S.D.N.Y. Jan. 4, 2013) (citing Estate of Ungar v. Palestinian Auth., 400 F. Supp. 2d 541, 554 (S.D.N.Y. 2005)). This is because standing "extends only so far as to assert [a party's] own interests, not those of the subpoenaed nonparty." R. Prasad Indus. v. Flat Irons Envtl. Sols. Corp., 2014 WL 2804276,

at *8 (D. Ariz. June 20, 2014). Because the subpoenas here command only non-parties to produce documents, Petitioners have no interest that the 100-mile rule protects. See, e.g., id. ("the 100-mile geographical limit set forth in Rule 45(c)(2)(A) . . . protects only [the subpoenaed bank] because the subpoena commands only [the bank] to produce the documents"); Johnson & Johnson v. Advanced Inventory Mgmt., Inc., 2020 WL 4904568, at *3 (N.D. Ill. Aug. 20, 2020) (petitioner lacked standing "to object to the fact that . . . plaintiffs' subpoenas request that the Banks produce documents more than 100 miles from their place of business."); Square D Co. v. Breakers Unlimited, Inc., 2009 WL 1702078, at *1 (S.D. Ind. June 11, 2009) (same).

B. Timeliness

Lilly argues that the motion to quash is untimely because it was filed after the return date for the subpoenas. Opp. at 12–13. See generally Nike, Inc. v. Wu, 349 F. Supp. 3d 310, 320 (S.D.N.Y. 2018) ("In order to be timely, a motion to quash a subpoena generally must be filed before the return date of the subpoena.") (quoting Bouchard Transp. Co. v. Associated Elec. & Gas Ins. Servs. Ltd., 2015 WL 6741852, at *1 (S.D.N.Y. Nov. 4, 2015)). Petitioners respond that this deadline was missed because they did not receive notice that the subpoenas existed until after their return dates had passed. Reply at 4. District courts have "broad discretion over the decision to quash a subpoena, and a number of courts in this Circuit have exercised their discretion to consider motions to quash that were not timely filed within the meaning of Rule 45 and applicable case law." Nike, 349 F. Supp. 3d at 320 (quoting Bouchard Transp., 2015 WL 6741852, at *1); accord In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.), 581 F. Supp. 3d 509, 516 (S.D.N.Y. 2022) (collecting cases). Given the circumstances of the missed deadline, we exercise that discretion here. Moreover, to the extent Lilly argues that Petitioners unduly delayed filing their motion after receiving proper notice, we need not delve into this issue

because Lilly has not shown any prejudice resulting from such delay and courts commonly extend the time to file a motion to quash where no prejudice has been shown. See, e.g., Langford v. Chrysler Motors Corp., 513 F.2d 1121, 1126 (2d Cir. 1975); accord YouTube, 581 F. Supp. 3d at 516 (rejecting the claim that defendant's motion was moot because defendants "raise[] no claim of prejudice resulting from the delay."). Accordingly, we reject the argument that Petitioners' motion is untimely.

C. Mootness

Lilly contends that Petitioners' motion is moot for Group 1 and Group 2 subpoenas. Opp. at 13, 15.

As for Group 1, we agree that Petitioners' motion to quash is moot. These subpoenas concern entities that either have no responsive documents or pose no threat of producing documents because Lilly is no longer pursuing them. Opp. at 8, 14–15. The court therefore cannot fashion any relief because no documents have been produced, nor will any be produced in the future. See, e.g., Persaud v. SEC, 2025 WL 831115, at *4 (S.D.N.Y. Mar. 17, 2025) ("[Petitioner's] motion to quash the TD subpoena is moot because TD did not have responsive documents in its possession, custody, or control.").

For the Group 2 subpoenas, Lilly argues that Petitioners' motion is moot because the subpoena recipients have already produced responsive material. Opp. at 13–14. But "a motion to quash is not necessarily rendered moot by production of the requested materials because '[w]hile a court may not be able to return the parties to the *status quo ante*[,] a court can fashion *some* form of meaningful relief.'" Bing Tang Vo, 78 F. Supp. 3d at 176–77 (quoting Church of Scientology v. United States, 506 U.S. 9, 12 (1992)) (emphasis in original). As courts in this district have held, document production does not render a motion to quash moot because "even

though [the subpoenaed entity] has already produced the information, plaintiffs can be ordered to return the information and prohibited from using it." Sony Music Ent. Inc. v. Does 1-40, 326 F. Supp. 2d 556, 561 (S.D.N.Y. 2004); Doe I v. Individuals, 561 F. Supp. 2d 249, 253 (D. Conn. 2008) (same); accord Mangouras v. Squire Patton Boggs, 980 F.3d 88, 96 (2d Cir. 2020) ("if the discovery was improvidently granted, this Court is positioned to grant meaningful relief by ordering that the documents be returned or destroyed") (application under 28 U.S.C. § 1782) (citing Church of Scientology, 506 U.S. at 13). Given that "the existence of . . . a remedy is all that is required to defeat mootness," Petitioners' motion to quash the Group 2 subpoenas is not moot because the documents can be returned or excluded altogether. Binh Tang Vo, 78 F. Supp. 3d at 177.

Accordingly, Petitioners' motion is only rendered moot as it pertains to subpoenas contained in Group 1.

D. Merits of the Motion to Quash

Federal Rule of Civil Procedure 45 allows a party to serve a subpoena for production of documents on a non-party. But, upon a timely motion, "the court for the district where compliance is required must quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A)(iii). Because Petitioners' standing is based on their privacy interests, the Court evaluates their motion to quash by "weighing the relevance or probative value of the documents being sought against the privacy interests . . . asserted." Solow v. Conseco, Inc., 2008 WL 190340, at *4 (S.D.N.Y. Jan. 18, 2008). "Subpoenas issued under Rule 45 are subject to the relevance requirement of Rule 26(b)(1)." In re Refco Securities Litigation, 759 F. Supp. 2d 342 (S.D.N.Y. 2011) (citing During v. City Univ. of N.Y., 2006 WL 2192843, at *2 (S.D.N.Y. Aug. 1,

2006)). Lilly, as the party seeking discovery, "bears the initial burden of proving that the information and testimony sought in the subpoena[s] are relevant and proportional to the needs of the case." Cohen v. Group Health Inc., 2022 WL 4534552, at *2 (S.D.N.Y. Sept. 28, 2022). Petitioners, as the movants, bear the burden of establishing the weight of their privacy interest. Merida Cap. Partners III LP v. Fernane, 2025 WL 1541072, at *5 (S.D.N.Y. May 30, 2025). Ultimately, motions to quash a subpoena are "entrusted to the sound discretion of the district court." United States v. Sanders, 211 F.3d 711, 720 (2d Cir. 2000) (citing Logan v. Bennington College Corp., 72 F.3d 1017, 1027 (2d Cir. 1995)).

Petitioners contend that the probative value of the documents sought does not outweigh their privacy interests because the subpoenas are too numerous and overbroad. Mem. at 13–15. On the former point, Petitioners first find fault in the sheer number of subpoenas served. Id. But the Stipulated Order Petitioners agreed to contained no limitation on the number of subpoenas served. Moreover, issuing subpoenas to over 1,000 entities was rendered necessary only because Petitioners failed to provide any information about which banks they use or where their bank accounts are located. Opp at 5–7.

The Petitioners also argue that the subpoenas are a "fishing expedition" that seek "financial records, untethered to the claims at issue." Reply at 7, 8. Here, the alleged fraud is extraordinarily complicated, involving hundreds of millions of dollars and thousands of transactions that span across multiple known and unknown individuals and entities. Opp. at 1, 18, 21. Thus, rather than being a fishing expedition, the information sought is essential for Lilly to become apprised of "the full extent of the fraud, who was involved, where the proceeds of the fraud have been transferred, and where they are now located." Id. at 18.

Petitioners argue further that the subpoenas suffer from "sheer overbreadth." Reply at 8. Petitioners point to the fact that the requested documents will potentially produce personal financial information that bears no relation to the issues in this case. Mem. at 6–7. But even if some aspects of Petitioners' financial history may prove to be irrelevant to Lilly's claim, this does not render Lilly's subpoenas improper. Courts in this district often permit broad discovery of bank records to investigate alleged fraud. See, e.g., Conopco Inc. v. Wein, 2007 WL 2119507, at *1 (S.D.N.Y. July 23, 2007) (upholding subpoena that sought "all bank records relating to 217 entities and individuals alleged to be associated with" the fraud); State Farm Mut. Auto. Ins. Co. v. Fayda, 2015 WL 7871037, at *3–4 (S.D.N.Y. Dec. 3, 2015) (granting motion to compel the Movants' bank records to aid in uncovering "evidence of complex financial transactions"); aff'd, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016); In re Rule 45 Subpoena Issued To JP Morgan Chase Bank, N.A., 319 F.R.D. 132, 135 (S.D.N.Y. 2016) (upholding subpoena that sought all bank records because they "may show further [improper] payments or other signs of collusion"). Here, the breadth of Lilly's subpoenas is justified by the scope and sophistication of the alleged fraud. See, e.g., Eastman Kodak Co. v. Camarata, 238 F.R.D. 372, 377 (W.D.N.Y. 2006) ("That breadth is justified, however, by the breadth of the conspiracy alleged in the complaint—in terms of duration . . . proceeds involved . . . and participants.").

While Petitioners complain of overbreadth, they offer up no realistic way Lilly could have narrowed its requests or obtained the information from alternative sources. Petitioners, as the party resisting disclosure, "bear the burden of establishing alternative sources for the information." Rahman v. Smith & Wollensky Rest. Grp., Inc., 2007 WL 1521117, at *7 (S.D.N.Y. May 24, 2007) (quoting United States v. Bonanno Organized Crime Family of La Cosa Nostra, 119 F.R.D. 625, 627 (S.D.N.Y. 1988)). Petitioners airily assert that Lilly "easily

could have more narrowly tailored its requests, targeted specific banks, or conducted discovery to find the information that would allow it to better do either of those things." Reply at 10. As an example, Petitioners suggest that Lilly could have asked for "specific alleged rebate proceeds or transactions involving the alleged resale of Trulicity." Mem. at 15. But such a request would have been futile because Lilly's rebate payments do not explicitly reference Lilly or Trulicity, Opp. at 22; nor does the rebate process provide "information that would allow Lilly to trace a specific rebate claim to the original sale of that product," Compl. ¶ 98. It also appears that other discovery channels would be similarly futile as Petitioners have also refused to respond to interrogatories that would provide relevant financial information. Opp. at 22. In the end, Petitioners have not only have failed to demonstrate how Lilly's request could have been more narrowly tailored but have failed to offer any alternative source that could provide the relevant information. Accordingly, we reject Petitioner's overbreadth argument. See Fayda, 2015 WL 7871037, at *4 ("a court will order . . . sensitive financial information produced where it is relevant to the action and there is a compelling need for the documents because the information is not otherwise readily available") (citing Rahman, 2007 WL 1521117, at *7); see also Griffith v. United States, 2007 WL 1222586, at *3 (S.D.N.Y. Apr. 25, 2007) (denying motion to quash because petitioner "has not shown how the Government's subpoena could be tailored more narrowly to obtain the relevant information.").

While Lilly attempts to distinguish cases such as Fayda, Eastman Kodak Co., and Conopco on the ground that the subpoenas upheld in those cases were of a more limited nature, see Reply at 8–9, the reasoning of those cases does not support any limitation on the number of banks properly served or the breadth of information requested. Here, the scope of the alleged

fraud and Petitioner's recalcitrance in providing financial information fully justifies the subpoenas.

Finally, Petitioners' privacy interests do not outweigh the relevance and necessity of Lilly's subpoenas. Petitioners argue that the balance weighs in their favor because the subpoenas "substantially intrude into [their] protected privacy interests," disclose "sensitive personal identifiers," and the information sought would "intrude[] . . . into [their] private financial affairs." Mem. at 14–15. While these are legitimate concerns, they do not outweigh the value of the information sought — particularly in light of the protections afforded by the protective order already issued by the District Court in Florida. See Protective Order, dated June 9, 2026, filed in Lilly v. DrugPlace, Inc., 26 Civ. 23516 (S.D. Fla.) (annexed as Ex. 9 to Potter Decl. (Docket # 8-9)) at 12. This order designates all the information produced in response to the subpoenas as confidential, thereby barring its disclosure to individuals not associated with this case. Id. In the end, Petitioners have not shown that their privacy concerns outweigh the relevance and necessity of Lilly's subpoenas. See, e.g., Conopco. Inc., v. Wein, 2007 WL 2119507, at *2 ("confidentiality of personal financial matters must yield to the Federal Rules of Civil Procedure [when] . . . confidentiality can be protected by a variety of means, most notably the confidentiality order entered in this action."); Fayda, 2015 WL 7871037, at *5 ("Neither of these [privacy] objections constitutes a reason to wall off this relevant information, especially since it will be designated confidential pursuant to the protective order entered in this case."); A. Farber & Partners, Inc. v. Garber, 234 F.R.D. 186, 192 (C.D. Cal. 2006) ("plaintiff's need for defendant Garber's financial documents outweighs defendant Garber's claim of privacy, especially when

the 'impact' of the disclosure of the information can be protected by a 'carefully drafted' protective order.") (collection cases).

CONCLUSION

For the reasons given above, the Petitioners' motion to quash Lilly's subpoenas (Docket # 1) is denied.

SO ORDERED.

Dated: October 23, 2026
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge